1

```
                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF VIRGINIA
                      Alexandria Division




-----------------------------:
                             :
UNITED STATES OF AMERICA      :
                             :
                             :
    -vs-                      :    Case No. 1:13-mj-542
                             :
                             :
ROBERT T. KOGER,              :
              Defendant.      :
                             :
-----------------------------:
```

PROBABLE CAUSE and DETENTION HEARING

September 9, 2013

Before:   John F. Anderson, Mag. Judge

<u>APPEARANCES:</u>

Chad I. Golder and Michael E. Rich,
Counsel for the United States

Peter D. Greenspun, Counsel for the Defendant

The Defendant, Robert T. Koger, in person

2

INDEX

WITNESS                              EXAMINATION        PAGE

    CHARLES E. PRICE, II

                                     DIRECT               3
                                     CROSS                7
                                     DIRECT              45
                                     CROSS               63


CLOSING ARGUMENTS BY:

    MR. GREENSPUN                                        73


COURT'S RULINGS

    THE COURT                                            79

C.E. Price, II - Direct

3

1          NOTE:  The case is called to be heard at 2:23 p.m. as

2    follows:

3          THE CLERK:  The United States versus Robert Koger,

4    case number 13-542-mj.

5          MR. GOLDER:  Good afternoon, Your Honor.  Chad Golder

6    and Michael Rich on behalf of the United States.

7          THE COURT:  Mr. Golder.

8          MR. GREENSPUN:  Good afternoon, Your Honor.  Peter

9    Greenspun for Mr. Koger.

10          THE COURT:  Mr. Greenspun.  Good afternoon, Mr.

11    Koger.

12          Okay.  So, this matter is here for a preliminary

13    hearing and detention hearing, is that correct?

14          MR. GREENSPUN:  That is, Your Honor.

15          THE COURT:  Is the Government prepared with its first

16    witness?

17          MR. GOLDER:  Yes, Your Honor.  The United States

18    calls Special Agent Charlie Price.

19          NOTE:  The witness is sworn.

20          CHARLES E. PRICE, II, called by counsel for the

21    United States, first being duly sworn, testifies and states:

22       DIRECT EXAMINATION

23    BY MR. GOLDER:

24    Q.   Good afternoon.  Please state your name.

25    A.   Charles E. Price, II.

C.E. Price, II - Direct

4

1    Q.    Where are you employed?

2    A.    I am a special agent with the FBI.

3    Q.    How long have you been employed with the FBI?

4    A.    For over 27 years.

5    Q.    Are you the co-case agent on the matter currently before

6    the Court?

7    A.    Yes.

8    Q.    Are you fully familiar with the factual investigation that

9    led to the defendant's arrest and appearance before this Court?

10   A.    Yes.

11   Q.    Do you know what the defendant, Robert Timothy Koger,

12   looks like?

13   A.    Yes.

14   Q.    How did you become familiar with his appearance?

15   A.    I executed three search warrants at his house and talked

16   to him each time, and then I met with him and his counsel on

17   two separate occasions.

18   Q.    Do you see the defendant in the courtroom today?

19   A.    I do.

20   Q.    Please identify him by stating where he is sitting and

21   what he is wearing.

22   A.    He is at counsel table wearing the green jumpsuit.

23          MR. GOLDER:  Your Honor, may the record reflect that

24   the witness has identified the defendant?

25          THE COURT:  Mr. Koger has been identified.

C.E. Price, II - Direct

5

1    BY MR. GOLDER:  (Continuing)

2    Q.   With the assistance of the Court Security Officer, I am

3    handing you what has been marked for identification as

4    Government's Exhibit 1.

5             Do you recognize this document?

6    A.   Yes.

7    Q.   What is it?

8    A.   That's the affidavit I submitted in connection with the

9    criminal complaint for Mr. Koger's arrest.

10   Q.   Do you have any corrections or additions to make to the

11   affidavit at this time?

12   A.   Just one clarification.  So, in I think paragraph 28 of

13   the affidavit when I talk about identifying Mr. Koger during

14   his second visit to Tampa, the videotape I am referring to is

15   the videotape of Dr. Patel's building versus the covert tape in

16   the meeting room.

17   Q.   Do you adopt this affidavit with that correction as your

18   testimony today?

19   A.   Yes.

20            MR. GOLDER:  Your Honor, we would like to move for

21   the item marked as Government's Exhibit 1 to be admitted into

22   evidence.

23            THE COURT:  Mr. Greenspun, any objection?

24            MR. GREENSPUN:  Your Honor, normally I wouldn't

25   object, but I do object in this instance.  I am sure the -- I

C.E. Price, II - Direct

6

1    assume the Court has had the opportunity to review the

2    affidavit since it is somewhat lengthy.

3              THE COURT:  I have.

4              MR. GREENSPUN:  This affidavit is full of conclusions

5    and opinions and things that are anything but factual.  So,

6    normally a complaint-related affidavit is factual, it's one,

7    two, three, four, five.  And here it's really much more of

8    Special Agent Price's opinion of things.

9              So, in this case I object.

10             THE COURT:  Well, I will give you an opportunity to

11   cross-examine the affidavit or what he is doing here.  But, you

12   know, there are certainly things in here that are far from

13   opinion as to, you know, it is the T-shirt, it is him, he has

14   reviewed certain things.

15             MR. GREENSPUN:  Sure.

16             THE COURT:  And things like that.  So, I mean, I

17   think under the circumstances, for the purposes of this

18   preliminary hearing, I will admit Government's Exhibit No. 1.

19             MR. GOLDER:  Your Honor, that concludes our evidence

20   with respect to probable cause.

21             THE COURT:  All right, thank you.

22             MR. GREENSPUN:  Judge, may I just whisper here for a

23   moment with counsel?

24             THE COURT:  Yes.

25             NOTE:  An off-the-record discussion is had between

C.E. Price, II - Cross

7

1    counsel.

2        CROSS-EXAMINATION

3    BY MR. GREENSPUN:

4    Q.   Okay.  Good afternoon.  Special Agent Price, you've been

5    essentially the lead agent since sometime in 2012 in the Koger

6    matters, is that right?

7    A.   Yes, sir.

8    Q.   All right.  And while it's referenced in your complaint,

9    if we refer to the prior matters as the Host matters, you will

10   know what I am talking to versus the Patel matters, is that

11   right?

12   A.   Yes.

13   Q.   All right.  And there has been no charge brought either by

14   way of complaint or direct indictment regarding the Host

15   matters, is that right?

16   A.   Well, not against the defendant, but there have been

17   charges brought against others.

18   Q.   I'm only talking against him unless I otherwise direct, is

19   that right?

20   A.   Okay, sure.

21   Q.   Okay.  And -- but we have been in -- we meaning you, me,

22   counsel for the Government, other agents, been in fairly

23   regular contact since October or so of last year regarding the

24   Koger Host matters, is that right?

25   A.   Yes, sir.

C.E. Price, II - Cross

8

1  Q.   All right.  Meetings at the U.S. Attorney's Office, my

2  office, telephone calls, too many e-mails, and so on, right?

3  A.   Yes, sir.

4  Q.   All right.  And as far as this investigation is concerned,

5  this being the one that is the subject of your complaint, it

6  centers around, as I read your affidavit, this two-and-a-half

7  million dollars paid in early July, somewhere around July 3 or

8  thereabouts, by Mr. Patel -- or Dr. Patel or one of his

9  entities related to a -- to what, I guess is my question?

10  A.   Well, there is really two components.  Okay.  The first

11  component is the successful fraud of -- that was consummated on

12  -- or were finished on July 3 in which Dr. Patel paid

13  $2.5 million to Rick Thompson d/b/a P-A-A-G essentially to

14  withdraw their bid to buy a note that BlackRock, which is an

15  equity firm, held on Dr. Patel's hotel in Pittsburgh.

16        So, first component is that.  The second component is

17  a follow-on fraud in which the defendant is trying to get

18  $15 million from Dr. Patel now to walk away from an agreement

19  to buy the hotel.

20        So, it's really two components.

21  Q.   Okay.  Well, your affidavit explains and I can -- do you

22  have a copy in front of you?

23  A.   I do.

24  Q.   All right.  Your affidavit explains that the

25  two-and-a-half million dollars in July was part of a $5 million

C.E. Price, II - Cross

9

1    deposit for the purchase of the Wyndham Hotel in Pittsburgh, is

2    that right?

3    A.   Well, there --

4    Q.   Just isn't that what your affidavit says?

5    A.   My affidavit says that's what Dr. Patel believes it was to

6    be.  It was to be -- it was to be a $2.5 million walk-away fee.

7    And the money, the 2.5 million was to serve as a deposit in a

8    second transaction.

9    Q.   Okay.  And the two-and-a-half million was part of that

10   deposit for the purchase agreement, is that correct?

11   A.   That's what Dr. Patel says, yes.

12   Q.   All right.  Now, let me ask you this.  What documents do

13   you have that relate to any person or entity, whether actual

14   entity or actual person or not, that shows the transactional

15   nature of the history from the spring of 2013 between the Koger

16   side, if you will, and the Patel side?

17   A.   So, there is a document that is signed with regard to the

18   2.5 million saying this 2.5 million is to walk away.

19         And there is a second document that is the purchase

20   for 87.5 million of the hotel.

21         And then there is a third document, which Mr. Koger

22   signed last week during the sting in which he said, I will buy

23   the hotel for 128 million when he was posing as Stern.

24   Q.   Okay.  Now, as far as this $2.5 million walk-away from the

25   note purchase, that's the early July transaction, right?  When

C.E. Price, II - Cross

10

1   did you receive that document?

2   A.   Sometime within the last two weeks.

3   Q.   When did you receive it, Special Agent Price?

4   A.   Sometime in the last two weeks.  I can't tell you the

5   exact date.

6   Q.   Well, let me be specific.  July 5 Mr. Koger was arrested

7   at 6:30 in the morning without prior knowledge.  Did you have

8   the July --

9        THE COURT:  That was -- that was longer than two

10  weeks from today.  So, the answer to that question is clearly

11  no, right, Mr. Greenspun?  He said he got it within the last

12  two weeks.

13       MR. GREENSPUN:  Okay.  I'm sorry, I said the wrong

14  day.  I misstated the date.  He was arrested last Thursday,

15  September 5, is that correct?

16       THE COURT:  You said July 5.

17       MR. GREENSPUN:  I am sorry, my mistake.

18  BY MR. GREENSPUN:  (Continuing)

19  Q.   September 5 when Mr. Koger was arrested, did you have the

20  note/walk-to p/two-and-a-half million dollar document at that

21  point?

22  A.   Yes.

23  Q.   And did you -- you represented in the affidavit,

24  throughout the affidavit that that money was to be placed in

25  escrow, is that correct?

C.E. Price, II - Cross

11

1    A.   Yes.  Dr. Patel says the 2.5 was to be part of a 5 million

2    dollar escrow for the second transaction.

3    Q.   But at the time you submitted that document to, I believe

4    it was Magistrate Judge Buchanan on perhaps on the 4th of

5    September, last Wednesday, you knew that there was no escrow

6    language in that agreement, is that correct?

7    A.   Which agreement are you talking about?  There is, in the

8    second agreement there is --

9    Q.   No, I'm talking about in the early July walk-away

10   agreement.

11   A.   Right, that's right, there are two separate agreements.

12   Q.   May I ask the Court Security Officer to -- actually, Your

13   Honor, I have another copy for the Court, if I may.  Could I

14   have this marked as Defendant's Exhibit -- Koger Exhibit 1,

15   please.

16          Have you seen that agreement before?

17   A.   Yes, sir.

18   Q.   All right.  And it is titled Agreement, but it's called a

19   services agreement, right?

20   A.   That's what it says on the first page, yes.

21   Q.   Okay.  And your testimony is that you had that before the

22   complaint was issued and the affidavit was signed, is that

23   right?

24   A.   Yes.

25   Q.   All right.  And so, you have reviewed that by now, I take

C.E. Price, II - Cross

12

1   it, right?

2   A.   Yes, sir.

3   Q.   And how long did you have that as of September 4?

4   A.   As I told you before, I can't remember, but at some

5   point -- I can narrow it down to the window.  We did the sting

6   on a Thursday.  We started the investigation the prior Friday.

7            So, everything relating to the Tampa investigation

8   began a week prior on a Friday.  So, sometime within that

9   window.

10  Q.   All right.  So, the representation that you have -- if you

11  go to the complaint affidavit, please.

12  A.   Yes.

13  Q.   You start referring to that more specifically in

14  paragraphs 14, 15, and 16.  And in paragraph 16 you say:  In

15  addition, in violation of the July 3, 2013 agreement, Patel's

16  2.5 million was not -- and that's underlined -- held as a

17  nonrefundable deposit.

18           And then you explain that it wasn't held in escrow in

19  a number of places, isn't that right.

20  A.   Yes.

21  Q.   All right.  Where in the services agreement, Defense

22  Exhibit No. 1, does it call for that two-and-a-half million

23  dollars to be held in escrow, or in any particular account, or

24  for any purpose other an walking away from the BlackRock deal?

25  A.   It's not in that agreement.

C.E. Price, II - Cross

13

1   Q.   Okay.  Do you have any other document that says that that

2   money will be held in escrow?

3   A.   No.

4   Q.   Where did you get that information that you included in

5   the affidavit despite the fact you had a document that didn't

6   call for that?

7   A.   I get that from --

8            THE COURT:  Well, paragraph 11 will tell you the

9   answer to that, won't it?  TS told Patel that Patel's 2.5

10  million would be placed in TS' trust account.  Thompson would

11  add an additional two-and-a-half million to the trust account.

12  And the $5 million would serve as Thompson's nonrefundable

13  deposit to purchase the hotel.

14           MR. GREENSPUN:  I'm trying to find out, Your Honor,

15  where he got that information because as of last week, as far

16  as I knew, they had not spoken, they being law enforcement, to

17  TS.

18           THE COURT:  Well --

19           MR. GREENSPUN:  So --

20           THE COURT:  Okay.

21  A.   Could you give me the question again, sorry?

22  BY MR. GREENSPUN: (Continuing)

23  Q.   Sure.  TS is an actual attorney in the Tampa, Florida

24  area, is that correct?

25  A.   Yes.

C.E. Price, II - Cross

14

1   Q.   And as of the time that you signed the affidavit, you --

2   and when I say you, I mean you and law enforcement, had not

3   spoken to TS, who is Thomas Smith, is that right?

4   A.   That's right.

5   Q.   Have you yet spoken with him?

6   A.   Yes.

7   Q.   Okay.  And so, when you signed this affidavit in paragraph

8   11 and said, TS then told Patel, that was according to Patel, I

9   assume?

10  A.   Well, it was according to Patel.  Karen, I can't remember

11  her last name --

12  Q.   Wilson?

13  A.   Dr. Patel's lawyer.  And then Gus Santrone, a second

14  lawyer.  So, it's those three people told me that.

15  Q.   Okay.  So, it's Patel and two of his attorneys, at least

16  one of whom is in-house in his company, correct?

17  A.   I believe Karen is in-house, yes.

18  Q.   Okay.  And -- but it was Patel who was doing the talking,

19  is that correct?

20  A.   No.

21  Q.   No?

22  A.   No.

23  Q.   Did you speak to Patel?

24  A.   Yes.

25  Q.   All right.  Other than to set up the sting meeting, did

C.E. Price, II - Cross

15

1    you speak to Patel as in sitting down and interviewing him

2    about all this?

3    A.    Yeah.  What I did was Gus Santrone, who is the -- I guess

4    the second lawyer, I will just call him the second lawyer, he

5    wasn't there when the transaction was -- most of the

6    transaction was ongoing.  He set up and affidavit which laid

7    out everything.

8          I got the affidavit and I called and did a conference

9    call with Dr. Patel, Gus Santrone, and Karen, all three of

10   them, and I laid out the essence of the complaint to Dr. Patel.

11   And I said, this is the essence of what this affidavit says.

12   Is that what happened?  And then he said, yes.  And then I

13   asked a couple of follow-on questions.

14         So, that -- so, it was initially brought to me by

15   affidavit from Gus Santrone, and then subsequently confirmed

16   during a phone call with Karen and Dr. Patel.

17   Q.    So, you're talking not about your affidavit, about an

18   affidavit by Santrone?

19   A.    Right.  Well, it's an affidavit I think styled, you know,

20   as if Patel is going to sign it, but I think Santrone wrote it.

21   Q.    Who signed it?

22   A.    I don't think it is signed.  It's an affidavit.  They

23   brought this matter -- they initially attempted to get law

24   enforcement in Florida involved in this situation.  And my

25   assumption is that they prepared this for when they went to

C.E. Price, II - Cross

16

1   talk to Florida law enforcement and said, here is a summary of

2   the facts in this case.  But that's where the affidavit came

3   from.

4   Q.   Okay.  Well, you're calling it an affidavit.  This is an

5   unsigned document that sometime you got ahold of, is that

6   right?

7   A.   Right.  I am calling it an affidavit because it is styled

8   in the form of an affidavit.

9   Q.   All right.  But it's unsigned, it's not sworn to?

10  A.   Right.

11  Q.   It's not verified or anything like that, right?

12  A.   Right.

13  Q.   No notary public, nothing?

14  A.   Right.

15  Q.   All right.  And so, you read it and then you talked to Dr.

16  Patel on the phone, right?

17  A.   Yes.

18  Q.   All right.  And you said, is this basically what happened,

19  right?

20  A.   No.  I said, this is my understanding of -- the Cliffs

21  Notes version of the affidavit.  Is that what happened?

22  Q.   And he said, yeah, sure?

23  A.   Yes.

24  Q.   Okay.  Did you ever get a nonconclusory statement from Dr.

25  Patel in which you said, I want to go through this transaction

C.E. Price, II - Cross

17

1    about the Wyndham $40,000 note and your walk-away of it and

2    let's look at the documents together?  Did you ever do anything

3    like that?

4    A.    Yes.

5    Q.    Before the -- before Koger was arrested?

6    A.    Yes.

7    Q.    All right.  And when did you do that?

8    A.    That was during that call.  And then on I believe -- that

9    was on Friday night.  I believe on Sunday when we started the

10   sting, I said, let me understand where the negotiations are

11   with Mr. Thompson and Mr. Stern because I want to craft some

12   communications with those parties that we'll -- you know, we

13   can use to see if we can get Mr. Stern to visit you again.

14           And so, in order to do that, I had to understand, you

15   know, the current status of his discussions with both parties.

16   Q.    Did Patel, Wilson, or Santrone, anybody else for that

17   matter, send you an e-mail or any kind of communication --

18   documentation that stated that the two-and-a-half million

19   dollars paid in early July would be held in escrow?

20   A.    Yes.

21   Q.    What?

22   A.    I think that's the affidavit I was talking about.

23   Q.    Okay.  Anything else other than that affidavit?

24   A.    No.

25   Q.    Okay.  Is Dr. Patel under any sort of investigation in

C.E. Price, II - Cross

18

1    Florida, here, state, federal, any law enforcement agencies?

2    A.    Yes, he is.

3    Q.    For what?

4    A.    He is the subject of an FBI investigation in Tampa on

5    healthcare fraud.

6    Q.    Okay.  Fair to say that Dr. Patel is a well-known and

7    large player in healthcare and health insurance matters in

8    Florida?

9    A.    I don't know.  I understand he is rich, but I don't know

10   that he is -- I can't tell you about his medical pedigree.

11   Q.    Have you Googled him?

12   A.    No.

13   Q.    Okay.  And it was only after Dr. Patel learned that he was

14   the subject of law enforcement investigation that he started to

15   bring up this Wyndham Hotel matter to law enforcement, right?

16   A.    Say that -- I am sorry, you have to ask the question -- I

17   am going to go clarify my answer.  I Googled Patel to find his

18   address and stuff, but I didn't Google him to find out, you

19   know, his background.  I Googled him to find --

20   Q.    Special Agent Price, are you telling the Court that when

21   you did that and you saw page after page of Patel and about how

22   he donates millions of dollars to Florida universities, and his

23   medical career as a cardiologist, and his litigation history,

24   all of which shows up in a 30 second Google search, that you

25   didn't look at any of it or have someone look at it?

C.E. Price, II - Cross

19

1   A.   No.  I called the Tampa FBI and they told me about him.

2   Q.   Oh, okay.  And they told you he is a fraud through and

3   through, didn't they, to use the vernacular?

4   A.   No.  What they told me -- No, they didn't tell me that,

5   no.

6   Q.   They told you he is in trouble though, right?

7   A.   They told me he was under investigation, he and his

8   company were under investigation for fraud.

9   Q.   And they told you that then out of his proffers and his

10  counsel, that that's where this information that leads us here

11  today came from, is that right?

12  A.   Right.  I think his counsel contacted the Tampa FBI first

13  before they called us.

14  Q.   So, Patel talks to his counselor, who then talks to the

15  FBI and says, Patel may have some information for you, right?

16  A.   The counsel calls.  Well, actually the counsel called AUSA

17  Mike Rich.

18  Q.   Okay.  And at that point did you become even a bit

19  suspicious that maybe Patel is trying to cover his hind side

20  there as far as his own problems are concerned by cooperating,

21  and I am using air quotes here, with law enforcement regarding

22  Koger?

23  A.   No.  What I was concerned about was I knew that Patel

24  would have a credibility problem, so I knew I had to

25  corroborate what he was saying.  So, I needed to get Stern back

C.E. Price, II - Cross

20

1    down to Tampa so I could get what was happening on tape because

2    I realized that he would have credibility issues.

3    Q.   All right.  So, when you then -- so, I go back to this

4    July 3 or thereabouts two-and-a-half million dollar transfer

5    that Patel and his lawyers, his business lawyers, had

6    represented was supposed to be part of a $5 million Wyndham

7    Hotel $87 million purchase in late July or early August.

8            Have you found from any source beside the unsigned

9    affidavit a communication with Stern, with Thompson, with

10   Koger, or any PAAG, any of the related P-A-A-G, any of the

11   related entities, have you found one e-mail that says that?

12   One document?

13   A.   Document?  No.  That was a verbal agreement.

14   Q.   And who was the agreement between?

15   A.   Between Dr. Patel and the person who called himself Rick

16   Thompson, who I believe to be your client.

17   Q.   Okay.  And did Patel -- so, Patel says that he talked to

18   Rick Thompson?

19   A.   Yes.

20   Q.   How many times did he say he talked to Rick Thompson?

21   A.   He didn't give me a number.

22   Q.   And this would have been during what time frame, sir?

23   A.   I think it began around May, I could be wrong on that, and

24   included all the way up until the sting.

25   Q.   Did you get Patel's phone records to try to verify that?

C.E. Price, II - Cross

21

1   A.   No.

2   Q.   Did you get Koger's/Thompson's phone records to try to

3   verify that?

4   A.   No, I got Mr. Thompson on the phone with Dr. Patel in a

5   consensually monitored phone call.

6   Q.   No, I am talking about the May, June, July time frame, not

7   the end of August.

8   A.   No.

9   Q.   Now, you have spoken to Tom Smith, the attorney, is that

10   right?

11   A.   Yes.

12   Q.   And he told you -- as of Friday you had not spoken to

13   Thomas Smith, right?

14   A.   Last --

15   Q.   Friday of last week, September --

16   A.   Wrong, I spoke with him last Friday, last Friday.

17   Q.   Okay.  So, you did not speak with him or attempt to speak

18   with him before Mr. Koger was arrested, is that right?

19   A.   That's right.

20   Q.   All right.  And when you spoke with him, you asked him if

21   he was the person who undertook the transactional part of all

22   of this with Patel, is that right?

23   A.   Yes.

24   Q.   And so, talking about the note purchase/walk-away

25   agreement, he told you that he was the person who dealt with

C.E. Price, II - Cross

22

1    Patel on that, right?

2    A.   He was one of the people, and Rick Thompson also dealt

3    with Patel directly.

4    Q.   Did he tell you that -- did he tell you that Mr. Thompson

5    dealt with Patel?

6    A.   Yes.

7    Q.   And how did Thompson deal with Patel?

8    A.   Well, he said that Rob Koger called him and said, I would

9    like to get introduced to Patel, and I would like to get Rick

10   Thompson introduced to Patel, would you introduce Rick Thompson

11   to Patel.

12   Q.   So --

13   A.   And he said -- and Rob, according to, you know, Mr. Smith,

14   Koger said, don't tell Patel I'm involved in the transaction,

15   just introduce Rick Thompson to Dr. Patel.

16   Q.   Okay.  Did he tell you, don't introduce -- don't tell him

17   that I'm involved because he hates me from some prior dealings,

18   or words to that effect?

19   A.   Yeah, something like that.

20   Q.   All right.  And so, Smith is a licensed practicing

21   attorney of some 40 or 45 years, right?

22   A.   Yes.

23   Q.   65, 70 years old, right?

24   A.   Something like that, yes.

25   Q.   All right.  And he told you that there was no escrow

C.E. Price, II - Cross

23

1   agreement between Patel and Thompson or the PAAG-related

2   entities, right?

3   A.  He said -- you know, let's get it exactly right.  He said

4   that these two transactions while occurring simultaneously were

5   separate transactions.

6   Q.  Okay.  And that the two-and-a-half million dollars was

7   never part of the $5 million deposit that Patel -- Patel's

8   quasi-affidavit had described to you, right?

9   A.  That's right.  He said that money, the five million in the

10  second transaction was supposed to come from Thompson, and

11  Patel's money wasn't going to be in it.

12  Q.  And you -- so, you knew as of -- strike that.

13          When you spoke to Mr. Smith, the attorney, you did

14  that by telephone, I assume?

15  A.  Yes, sir.

16  Q.  All right.  And did you record that call?

17  A.  Yes, I did.

18  Q.  Did he know you recorded it?

19  A.  No, he did not.

20  Q.  Okay.  And you introduced yourself as a special agent with

21  the FBI and that you were investigating what?

22  A.  I was investigating -- I said I would like to talk to you

23  about this -- I told him initially, Rob Koger has been

24  arrested, and I wanted to talk to him about Rob Koger and the

25  2.5 million or 2.4 million that I was chasing.

C.E. Price, II - Cross

24

1   Q.   And I assume you didn't do -- use leading questions

2   because you wanted to find out what Mr. Smith knew or didn't

3   know, right?

4   A.   Well, I mean, I asked -- you can listen to the tape and

5   figure out whether they are leading, but I asked kind of

6   open-ended questions so he could answer them.

7   Q.   Well, I would love to, but you were on the phone this

8   morning when I asked for Brady materials and --

9              THE COURT:  This is a preliminary hearing.

10             MR. GREENSPUN:  Yes, sir.

11             THE COURT:  You know, you will get a chance to try

12  the case at some point if you get beyond this.

13             MR. GREENSPUN:  I understand, Judge, but -- well, I

14  won't argue.

15  BY MR. GREENSPUN: (Continuing)

16  Q.   So, you knew as of Friday that what was in the Patel

17  unsigned affidavit about the two-and-a-half million being part

18  of the five million, you knew from Smith that that was false,

19  right?

20  A.   Well, I mean, that Smith tells a different story, but I

21  also knew that it was basically irrelevant because even if

22  Smith's version is true, the 2.5 million was paid to withdraw a

23  bid on the BlackRock note, I knew that the bid on the BlackRock

24  note never happened.

25             So, therefore, whether the two transactions are tied

C.E. Price, II - Cross

25

1    together or not, it's still a fraud because the 2.5 million was

2    transferred in exchange for withdrawing a nonexistent bid.

3            So, that's a fraud too.  So, it doesn't really matter

4    whether they're tied.

5    Q.   Well, that will be for somebody else to say whether it

6    matters our not.  My point is, is that you want the Court to

7    accept your affidavit as being accurate, not only accurate, but

8    also fair, right?

9    A.   That's right.

10   Q.   And we've talked about, and I won't go through it sentence

11   by sentence, that in a number of places in this affidavit you

12   suggest -- not suggest you state very directly and pointedly

13   that the two-and-a-half million dollars was to be held in

14   escrow to be combined with another two-and-a-half million

15   dollars at the end of July for the purchase -- to be the

16   deposit for the purchase of the Wyndham Hotel in Pittsburgh,

17   right?

18   A.   Yes.

19   Q.   All right.  You knew when you wrote that that the services

20   agreement did not include any sort of escrow language, right?

21   A.   Right.

22   Q.   Okay.  And you now by Friday spoke with the attorney who

23   drafted the services agreement, right?

24   A.   I am not actually sure he drafted it, but I did talk to

25   Smith.

C.E. Price, II - Cross

26

1   Q.   And you asked him about the services agreement, right?

2   A.   Yes.

3   Q.   And he told you, without you asking him what you were

4   getting at, that there was no cause for that to be escrowed for

5   any purpose, it was just a fee to get these guys to walk away

6   from the note purchase, right?

7   A.   Yes, that's what he said.

8   Q.   Did you then call up Patel and his in-house attorneys and

9   say, why did you say that this was an escrow?

10  A.   No.

11  Q.   So, understanding that you would suggest to the Court that

12  you wrote what you believed was correct as of Wednesday of last

13  week, you now know there is significant reason to believe that

14  what you wrote as far as the two-and-a-half million dollars in

15  early July was in fact false because you had been misled by

16  Patel and his people, right?

17  A.   No, I don't have any reason to believe it is false.  I

18  have two people telling me two different stories.  I don't know

19  at this point which one is true.

20  Q.   Well, did you ask Patel and his people for documentation,

21  not the unsigned affidavit, give me some documentation, give me

22  anything that relates to the note by -- walk-away on the note?

23  A.   Say -- well, no -- yes, I said, I'm coming -- I said,

24  there is a difference of opinion, and I'm going to be coming

25  down there to talk to you, pull all the stuff together.

C.E. Price, II - Cross

27

1   Q.   And did you say, is there anything at all, is there any

2   agreement?  This is two-and-a-half million dollars, somebody

3   must have sent something, an e-mail, a confirmatory letter, an

4   agreement.  You had already asked for that, right?

5   A.   There are -- it is my understanding that there are plenty

6   of fighting e-mails after the fact saying, you know, this is

7   what is supposed to have happened.  I haven't reviewed them

8   all.

9   Q.   Okay.  But did you ask for anything that relates to the

10  transaction itself, the July 3 transaction to see if there was

11  any verification of their side at all?

12  A.   No.  I think I have both documents, and I don't think

13  there is anything other than the two documents we have talked

14  about that are signed by the parties evidencing their

15  agreement.

16  Q.   I know you don't know precisely when except it is in the

17  last couple of weeks, but from whom did you get the agreement

18  that starts:  This services agreement?

19  A.   I am pretty sure it is from Gus Santrone, the lawyer, but

20  I stand to be corrected.  I believe it is from Gus Santrone.

21  Q.   Now, as far as the Wyndham buyout is concerned, Wyndham

22  purchase --

23  A.   I'm sorry, the purchase of the hotel?

24  Q.   The hotel.

25  A.   Okay, got it.

C.E. Price, II - Cross

28

1    Q.    Too many similar terms for my -- you -- there were e-mails

2    and documents going back and forth, it sounds like you have

3    seen at least some of them, between Tom Smith to Patel, were

4    his agents, attorneys, all throughout July, right?

5    A.    That's my understanding, yes.

6    Q.    And Thomas Smith had prepared and sent over a letter of

7    intent and then purchase agreements with regard to the

8    $87-and-a-half million hotel purchase, right?

9    A.    I don't know who -- I don't know who prepared them, but

10   they had existed, if that's your point.

11   Q.    And Tom Smith was becoming fairly insistent by the end of

12   July about, hey, it's silence on your side, I need to hear back

13   about these agreements, right?

14   A.    I can't -- I don't know.  I know that there was ongoing

15   discussion with regard to consummating the deal.

16   Q.    You asked Mr. Smith about that, I assume, last Friday when

17   you talked to him?

18   A.    About -- about his involvement?  Sure I did.

19   Q.    And he told you that all through the month of July that

20   this had moved on from walk away from the note on the hotel to

21   buying the hotel?

22   A.    Right.

23   Q.    And that he was dealing at arm's length with Patel and his

24   attorneys trying to get the agreement language settled, right?

25   A.    Well, why I'm pausing is at some point, and I don't know

C.E. Price, II - Cross

29

1    the date, that's why I'm pausing, at some point Smith was taken

2    out of the deal.  And so, I don't know -- I can't remember when

3    that was.  But at some point Thompson, quote unquote, tells

4    Smith, you're out of the deal, you're a witness to the earlier

5    transactions, I'm going to have my other lawyers handle this

6    deal.  And so, that's why I'm hesitating.  I don't know exactly

7    when that happened.

8    Q.   He told you that was the very end of July, didn't he?

9    A.   That's what I am saying, I can't remember.  If you can --

10   Q.   Do you need to look at something to see --

11   A.   Well, if you can let me look in my affidavit, I think I

12   might have it referenced in there.

13   Q.   Sure.

14   A.   Yes, it's August 5, not the end of July, August 5.  He

15   says, my clients have been 100 percent compliant with the

16   binding LOI from your update, from July 3 to July 31, at which

17   time I am taken out of the loop and his team of, you know --

18   Q.   There is --

19   A.   For a variety of reasons.  So, he is taken out basically

20   he says on July 31.

21   Q.   And he told you that he was taken out because, to use the

22   phrase you used, not because of any problem, but because this

23   was no longer sort of the standard real estate transaction?  It

24   was part of a different negotiation, right?

25   A.   That's what he says in the e-mail.  I didn't talk to him

C.E. Price, II - Cross

30

1    about why he was taken out specifically.

2    Q.   Was there a reason you didn't ask him about that?

3    A.   Yes.

4    Q.   What?

5    A.   I was chasing the money.  And I was trying to understand

6    his frame of mind, and I was trying to understand what

7    representations he made to Patel, and whether they were

8    truthful or not.

9    Q.   So, then what was the reason that you didn't ask him if it

10   was sort of part of the dealings with his client that somebody

11   else moved in, it was just a regular lawyer change?

12   A.   Well, it didn't really matter.  The fact of the matter was

13   that he was out, some other lawyers were in.  The reason why

14   wasn't that particularly relevant to me.

15   Q.   Well, in paragraph 18 of your complaint, if you will look

16   at the language in quotes single spaced.

17   A.   Okay.

18   Q.   And your suggestion in including that was that Smith was

19   taken out in some nefarious fashion, wasn't it?

20   A.   No, sir.  My suggestion in including that is that that's a

21   lie because it says they were 100 percent compliant with the

22   LOI.  And in fact, the LOI requires a $5 million deposit to be

23   made and that deposit wasn't made.  That's why I put it in

24   there.

25   Q.   Okay.  Do you know why the $5 million deposit wasn't made?

C.E. Price, II - Cross

31

1   A.   Well, I can speculate, but I don't know.

2   Q.   That wasn't due until August 1 under any reading of the

3   contract, was it?

4   A.   No, I think that's incorrect.  I believe if you look at

5   that binding LOI, I think it says as of the date of this

6   agreement, you know, there will -- simultaneous to this

7   agreement, the $5 million deposit will be made into my trust

8   account, I believe.  I haven't read the agreement in a day or

9   two.

10  Q.   Okay.  We will quibble over a day.  Were you aware that

11  the five million -- did you become aware or have you become

12  aware that the $5 million was not paid because the Thompson

13  group, the PAAG group, the purchasers of the hotel, found out

14  that Patel was going behind this purchase transaction to try to

15  get Wyndham to give them a better deal?

16  A.   No, I didn't find out -- I have two separate

17  representations, one that it was never paid to Dr. -- Mr.

18  Smith.  But he says that Thompson or some other person made a

19  representation to him via e-mail that the money was in deposit

20  in a New York bank, but that he couldn't confirm that, he

21  didn't have any details about what lawyers it was with, who he

22  should contact, but that some amorphous bank in New York was

23  holding the five million.

24  Q.   In fact, what they gave was they gave Patel a proof of the

25  funds, the availability of the funds, you're talking about that

C.E. Price, II - Cross

32

1   letter, Special Agent Price?

2   A.   No.  I'm talking about a statement that Mr. Smith made to

3   me in the phone call on Friday.  I'm saying that he made

4   representation to me during that phone call that some other

5   lawyers up in New York who he couldn't identify had received

6   the $5 million deposit, and he couldn't confirm it.

7   Q.   He told that you on Friday?

8   A.   Yes.

9   Q.   Okay.  And did you become aware that Tom Evans, the CEO at

10  Fyshe F-y-s-h-e, had confirmed the availability of funds in

11  excess of $100 million?

12  A.   No.

13  Q.   And were you aware that Patel went behind this deal and

14  attempted to have Wyndham during July make him a better deal as

15  far as the purchase is concerned?

16  A.   No.  If I may just correct one answer.  You're saying did

17  I -- with regard to the Fyshe question, I am aware that a

18  representation was made by, I think it's an attorney by the

19  name of Dan Larkin, that he forwarded, I think it is the Fyshe

20  letter, to one of the parties involved in the Tampa transaction

21  regarding funds that a related entity had.

22  Q.   Because they asked for proof of the availability of the

23  purchase funds, right?

24  A.   Yeah, I think so.

25  Q.   And that called for an up front $60 million at closing,

C.E. Price, II - Cross

33

1   and that was the purpose of that letter, was to verify that the

2   funds were available, right?

3   A.   I'm not positive on the background, but it was a -- it was

4   some sort of comfort that there was money out there.

5   Q.   Okay.  Now, the walk-away on the note required that PAAG,

6   P-A-A-G, notify BlackRock that they were withdrawing from the

7   $40 million offer, is that correct?  And they did that on

8   July 8, didn't they?

9   A.   No.  And that's not my understanding.  BlackRock doesn't

10  even know who these guys are, so I don't think that that's -- I

11  think that that is a false statement in there.

12  Q.   Okay.  And are you aware that on July 30 that Patel sent a

13  letter to Wyndham requesting their consent to the transaction?

14  A.   I believe I have seen like a two paragraph letter to

15  Wyndham, but I don't know when it was dated.

16          THE COURT:  Just so I'm -- the transaction, what

17  transaction are you talking about?

18          MR. GREENSPUN:  I'm sorry, I am mixing two.  This

19  would be the purchase transaction.

20          THE COURT:  The first purchase transaction?

21          MR. GREENSPUN:  Second.  The hotel purchase

22  transaction.

23          THE COURT:  But there are two hotel purchase

24  transactions, aren't there?

25          MR. GREENSPUN:  Well, the note relates to the same

C.E. Price, II - Cross

34

1     hotel, so it's all about the Wyndham in Pittsburgh.

2                THE COURT:  But there is one for 80-some million and

3     then there is another for 120 --

4                MR. GREENSPUN:  125 million, that's correct.

5                THE COURT:  So --

6                MR. GREENSPUN:  I will be more specific.

7     BY MR. GREENSPUN: (Continuing)

8     Q.   Talking about the 87-and-a-half million dollar

9     transaction, that was the subject of a letter of intent that

10    was agreed upon and signed off on in early July, wasn't it?

11    A.   Yes.

12    Q.   And it was dated the end of July because Patel wanted to

13    work through the purchase of the BlackRock $40 million note to

14    his benefit without Wyndham knowing about the possible sale of

15    the hotel, right?

16    A.   I don't know that.  I know it was -- the representation to

17    me was that it was signed on July 3, physically signed on

18    July 3, but dated July, I think, 30th.

19    Q.   Why did Patel want that to occur?

20    A.   I am not sure.  I am not sure it was Patel versus Mr.

21    Thompson.  I don't know.

22    Q.   Okay.  And so, you never asked anyone to explain that

23    fairly significant difference, right?

24    A.   I don't know that it's a significant difference because

25    the issue is whether there was a --

C.E. Price, II - Cross

35

1   Q.   Okay.

2   A.   I am sorry, if I can answer your question.  I didn't think

3   that that difference was significant.  I think that the

4   significant issue is is there a bid on the BlackRock note that

5   can be withdrawn in exchange for 2.5 million.  That's the

6   significant part of the deal.

7   Q.   Now, you know that the $5 million was not due for the

8   purchase, the $87 million purchase, was not due until July 31,

9   right?

10  A.   I think it says -- I can stand to be corrected, but my

11  understanding, I think it says:  As of the date of this

12  agreement, right, the signing of this agreement.

13  Q.   What's the date on it?  It is July 31, isn't it?

14  A.   Well, I understand the 30th or 31st.

15  Q.   The 30th --

16  A.   30th or 31st, right.

17  Q.   The end of the month?

18  A.   Right.

19  Q.   Okay.  And so, the $5 million was due then.  Do you

20  dispute or have evidence that Patel did not try to go around

21  the PAAG purchase group and get a better deal contrary to the

22  language in the LOI?

23          MR. GOLDER:  Object, Your Honor.  This has been asked

24  and answered, and this is bordering on discovery investigation.

25          THE COURT:  Well, if it has been asked and answered,

C.E. Price, II - Cross

36

1    it can be answered one more time and we'll just move on from

2    there.

3    A.    Again, I don't know what -- I know that he was trying -- I

4    know that he was trying to sell it to somebody else because he

5    talked, the defendant as Stern, trying to sell it to him.  So,

6    I know he was trying to sell it to at least one other person,

7    the defendant.  But I don't know if he was trying to sell it to

8    other folks.

9    BY MR. GREENSPUN:  (Continuing)

10   Q.    Okay.  And did you become aware as to whether or not Stern

11   was brought into it to see whether or not Patel was going to go

12   against the terms of the letter of intent which says that it

13   was confidential and there were to be no other sales marketing

14   attempts?

15   A.    I have no idea why your client jumped in as Stern.  You

16   would have to ask him.

17   Q.    You have seen the letter of intent dated July 30, right?

18   A.    Is that the $87.5 million contract from Thompson to --

19   Q.    Yes, sir.

20   A.    Yes.

21   Q.    All right.  Your Honor, if I may ask this to be handed up

22   to the Court, I don't think you have that.

23          Do you have a copy of it there?

24   A.    No, sir.

25   Q.    I ask that this be marked as Defense Exhibit No. 2.

C.E. Price, II - Cross

37

1          You have seen that before, right?

2   A.   Yes, sir.

3   Q.   All right.  And if you go to the second page of that

4   document, confidentiality.

5   A.   Right.

6   Q.   It says:  Buyer and seller agree to keep the contents of

7   this term sheet confidential, and so on.  Everybody can read it

8   here.

9          The gist of it was that this was a nondisclosure

10  agreement and this was to occur without going around this deal,

11  right.

12  A.   Right.

13  Q.   Okay.  You said that there was a default by not paying the

14  $5 million.  If Patel went around this deal before the

15  $5 million was due, you would agree that Patel may have been in

16  default of the LOI, right?

17          THE COURT:  Well, let me make sure I -- you are

18  saying this document was signed on July 30, or effective July

19  30?

20          MR. GREENSPUN:  It was signed --

21          THE COURT:  But you're saying it was effective --

22          MR. GREENSPUN:  Yes, sir.

23          THE COURT:  So, the parties' obligations came into

24  effect on July 30?

25          MR. GREENSPUN:  That's right.

C.E. Price, II - Cross

38

1          THE COURT:  And at the same time it says:

2     Simultaneous with that, $5 million is supposed to be paid,

3     right?

4          MR. GREENSPUN:  That's what that says, right.

5          THE COURT:  This in section 5.

6          MR. GREENSPUN:  Right.

7          THE COURT:  So, if somebody did something before the

8     effective date of this agreement, the agreement becomes

9     effective and $5 million is supposed to be paid upon the

10    effective date of this agreement, how does that play into your

11    argument here?

12         MR. GREENSPUN:  Well --

13         THE COURT:  So, the obligations that you're pointing

14    to that you must keep the contents of this term sheet

15    confidential in paragraph 6 become effective on July 30, the

16    signing of the agreement, right?

17         MR. GREENSPUN:  Your Honor --

18         THE COURT:  I mean, that's your point, is that this

19    agreement doesn't become effective until July 30?

20         MR. GREENSPUN:  It is.  And on July 30 Pittsburgh

21    Grand Hotel, that's Patel's group, sends to the Wyndham

22    department notice of their offer -- I will hand this up --

23         THE COURT:  Well, no, but at the time this agreement

24    was signed, was $5 million -- a nonrefundable deposit of

25    $5 million placed with the Thomas Smith trust account?

C.E. Price, II - Cross

39

1   Simultaneous with the effective date of this agreement.

2              MR. GREENSPUN:  Right.

3              THE COURT:  Okay.  I mean, that's what it says.  And

4   at the same time that provision become effective, this other

5   confidentiality provision became effective.  This says that you

6   can't -- you must keep the contents of this term sheet

7   confidential, right?

8              MR. GREENSPUN:  Right.

9              THE COURT:  Okay.  It doesn't say that you can't do

10  anything else.  It just says you can't disclose the contents of

11  this term sheet.

12             MR. GREENSPUN:  And, Your Honor, when I hand this up,

13  I don't have an extra copy of it, but it starts out with:  Dear

14  general counsel of Wyndham.  Pursuant to section 11.3 of the

15  management agreement dated effective June 8, 2011, between

16  Wyndham and Pittsburgh Grand Hotel, the owner hereby provides

17  notice to manager that owner has received a bona fide offer

18  from PAAG Holdings to purchase the Wyndham Hotel for a total

19  purchase price of $87.5 million.  Under the terms of the

20  proposed offer, buyer seeks to obtain fee simple interest and

21  so on.  Buyer proposes to close the transaction by no later

22  than October 31 and has placed a $5 million good faith deposit

23  in escrow.  The consummation of the proposed transaction with

24  buyer is conditioned upon certain consents and approval from

25  the manager.

C.E. Price, II - Cross

40

1          That's not true, there is nothing in the LOI that you

2   have before you that says that.  Under the terms of the

3   agreement, manager, that is Wyndham, has a right of first offer

4   and shall have 30 days from the date hereof to advise owner of

5   its intent to exercise its right of first offer.  Please feel

6   free to request additional information.

7          So, number one, there was no requirement of consent

8   by Wyndham as far as the sale is concerned.  The gist is, and

9   Your Honor is absolutely right, this is not a trial of the

10  case, but the Government has done a quick investigation here.

11  And the affidavit, and that's why I objected to it in this

12  case, is written through the agent's filter here with very

13  little by way of investigation that this is even criminal

14  versus a civil dispute between big businessmen.

15         Now, the Thompson and Stern, beyond unseemly -- and

16  we will address that as we need to address that, but Special

17  Agent Price also knew -- I mean, by his testimony, Koger tells

18  Smith why he is using a different name now.  That's in the

19  business world.

20         So, it's not as if this is all furtive.  This is a

21  business transaction.  The names are far less important than

22  anything else.

23         And as the Court might imagine, I could probably go

24  on and on and on as far as what happens in the month of August

25  and up through and including Stern.

C.E. Price, II - Cross

41

1          THE COURT:  Right.

2          MR. GREENSPUN:  I don't -- I have known Special Agent

3  Price a long time and I know how hard he works.  Judge

4  Anderson, I am not being patronizing here, he knows that I

5  respect his ability to work, but the affidavit is written that

6  the two-and-a-half million dollars on July 3 was to go into

7  escrow and to be saved and to be part of something that it

8  wasn't.  And the documents don't say that.  Smith doesn't say

9  that.  And if I hadn't talked to Koger to examine this over the

10  weekend, the Court wouldn't know that there was no escrow

11  agreement as far as that two-and-a-half million dollars was

12  concerned.

13          So, the suggestion is the two-and-a-half million

14  dollars goes into an escrow and is taken from an escrow that it

15  is not supposed to be taken from, and there is -- and that that

16  is wrongful.  And there is nothing about that at all.

17          And then what you're going to hear about is in

18  detention -- from a detention point of view about how that

19  impacts that.  I will leave for a little bit later here.  But

20  you're certainly going to hear it in that regard, and it's just

21  not true.  They have one phone --

22          THE COURT:  Two-and-a-half million dollars was paid.

23          MR. GREENSPUN:  Right.

24          THE COURT:  With the recital that BlackRock has

25  offered the note for sale, that bidder has submitted an offer

C.E. Price, II - Cross

42

1    of $4 million to acquire the note, and that borrower wants the

2    bidder to do it, and the borrower is willing to pay the bidder

3    to withdraw its bid and terminate any discussions regarding the

4    acquisition of the note.  So, two-and-a-half million dollars

5    was put into a trust fund of a lawyer.

6              MR. GREENSPUN:  Right.

7              THE COURT:  Okay.

8              MR. GREENSPUN:  Well, it's not even -- but it wasn't

9    to be held --

10             THE COURT:  So, where was the two-and-a-half million

11   dollars placed?

12             MR. GREENSPUN:  It went to, I forget --

13             THE COURT:  Well, it says TS trust fund.

14             MR. GREENSPUN:  Wells Fargo TS trust account.  But

15   there was nothing to require it to be held by anyone's

16   description, none, not the document, not according to the

17   attorney who gets a call from an FBI agent out of the clear

18   blue.  And Special Agent Price can't provide an e-mail, a

19   document, an exchange that says that, except for this vague

20   representation from a man who is under a huge -- well, I am

21   going to assume it is huge, but a large fraud investigation by

22   the FBI in Florida.

23             That's the -- that's the sum and substance of that

24   assertion versus what I'm trying to provide the Court, which is

25   the substantive -- the documentation of this which refutes

C.E. Price, II - Cross

43

1   exactly what Patel said in the unsigned affidavit.

2          So, Special Agent Price can have all his machinations

3   about where this should have gone and, okay, maybe it's --

4          THE COURT:  Patel says, this is what the lawyer told

5   me.  This is where it was going.

6          MR. GREENSPUN:  Right.

7          THE COURT:  And if we have a credibility issue -- I

8   mean, my dealings are preponderance, is there probable cause.

9   And you know what a low standard that is, Mr. Greenspun.

10          MR. GREENSPUN:  I do.

11          THE COURT:  And I have been very patient.

12          MR. GREENSPUN:  Yes, sir.

13          THE COURT:  And, you know, I only have a limited

14   amount of patience, and you are about to use it up.

15          MR. GREENSPUN:  Well, I --

16          THE COURT:  So, if you have got some really

17   significant issues that you think you need to raise on the

18   issue of probable cause for the charge that has been brought

19   against Mr. Koger in a criminal complaint, you better get to it

20   pretty soon.

21          MR. GREENSPUN:  May I have a moment?

22          THE COURT:  Sure.

23   BY MR. GREENSPUN: (Continuing)

24   Q.   In talking with and reviewing the note walk-away, I

25   believe you said -- and you said clearly in your affidavit that

C.E. Price, II - Cross

44

1    you have spoken with BlackRock and that they did not have any

2    recollection of PAAG, P-A-A-G, or Thompson as far as the

3    purchase of the $40 million note is concerned?

4    A.    That's right.

5    Q.    Who did you speak with?

6    A.    I think there's four individuals.  And I would have to

7    refer to my affidavit, I can't remember their names.  But there

8    was an outside counsel from Reed Smith, and then I think two

9    people from BlackRock, their names just escape me right now.

10   Q.    And what was Reed Smith's involvement?  That's the law

11   firm?

12   A.    I think they were -- I think -- yeah, right, I think that

13   they were involved in selling the note.  In other words, they

14   were counsel for BlackRock in handling that transaction.

15   Q.    The sale of the note to PAAG or a PAAG-related entity,

16   right?

17   A.    No, no, not this PAAG or PAAG -- they said they have never

18   heard of PAAG or Rick Thompson or any of those people.  They

19   were out on the market, for lack of a better term, selling the

20   note.  And then my question to them was, have you heard of Rick

21   Thompson, PAAG, PAAG Investments, PAAG Holdings, et cetera?

22   They said, no.  Did you ever get a $40 million bid?  No.

23   Q.    Okay.  So, if I could provide you with a document that

24   gives a different name or something, you would be able to

25   follow-up on that as well?

C.E. Price, II - Direct

45

1   A.   Sure.

2            MR. GREENSPUN:  Thank you, Your Honor.

3            THE COURT:  I don't feel I need any cross.

4            MR. GOLDER:  No redirect, Your Honor.

5            THE COURT:  Thank you.  All right.  Well, let me just

6   do -- do you have any other witnesses you are going to call on

7   the issue of probable cause?

8            MR. GOLDER:  No, Your Honor.

9            THE COURT:  Okay.  Mr. Greenspun, do you have any

10  witnesses that you plan to call on the issue of probable cause?

11           MR. GREENSPUN:  No, sir.

12           THE COURT:  All right.  I am going to go ahead and

13  have any testimony having to do with the issue of detention

14  done here, and then we'll deal with both of those issues at the

15  same time.  Any additional evidence you want to raise on the

16  issue of detention?

17           MR. GOLDER:  Yes, Your Honor.

18        DIRECT EXAMINATION

19  BY MR. GOLDER:

20  Q.   Special Agent Price, when executing the arrest warrant on

21  the defendant last week, did you also execute a search warrant

22  on his home and his car?

23  A.   Yes.

24  Q.   What, if any, evidence did you find related to the

25  movement of money from the escrow account described in your

C.E. Price, II - Direct

46

1    affidavit to a foreign bank account?

2    A.   We found a notepad with (unintelligible) where the

3    $2.5 million was moved to the Bahamas to I think Garland and

4    Company.  We found a handwritten note on a notepad, Garland and

5    Company, and then a bunch of, you know, looked to be wire --

6    you know, bank instructions or wire transfer directions on

7    that.

8    Q.   With the assistance of the Court Security Officer, I am

9    handing you what has been marked as Government's Exhibit 2.

10             Your Honor, we have several of these exhibits which I

11   will pass up to you in a packet.

12             THE COURT:  Okay.

13   Q.   What is this document?

14   A.   Sir, it's the document I was referring to we found in the

15   search of Mr. Koger's house.  It is a handwritten document,

16   Garland and Company.  That's the company that received the

17   $2.4 million that was sent to the Bahamas in re Royal Bank of

18   Canada.  And it alleges RBC -- Royal Bank of Canada is RBC, and

19   then there is Royal Bank of Canada of the Bahamas I believe is

20   the destination.

21             So, this looked to be, you know, notations with

22   regard to the $2.4 million wire.

23   Q.   Where was this document located, in what kind of

24   receptacle or --

25   A.   In the area of Mr. Koger 's desk.

C.E. Price, II - Direct

47

1    Q.    Okay.  What, if any, settlement agreements did you find at

2    the defendant's house during the search?

3    A.    Sir, we found -- in the second part of the fraud there was

4    an agreement to walk away for initially $15 million with Rick

5    Thompson.  We found four separate settlement agreements all

6    signed purportedly by Rick Thompson and witnessed, basically

7    which were documents evidencing the agreement to walk away.

8    One was like 11 million, one at 10.5, one at 10, and one with

9    no dollars in there I think.

10   Q.    Please look at Government's Exhibits 3 to 6 in the stack

11   of documents that you are being handed right now.  What are

12   these?

13   A.    Those are the -- yeah, these are the settlement agreements

14   that we found.  And I believe they were found in the -- I will

15   call it the Stern briefcase.  In the videotape of the second

16   meeting, Stern had a briefcase.  We found a briefcase similar

17   to that at the house that Stern was carrying during the sting.

18   And these documents were found -- I believe these documents

19   were found in that briefcase.

20   Q.    Why are there four documents?

21   A.    Well, because they were -- part of the sting, we were

22   negotiating a settlement of walk-away money, and they were back

23   and forth about, you know, how much am I going to have to pay

24   you to walk away.

25              So, my belief is that there is one at 11, one at

C.E. Price, II - Direct

48

1    10.5, and one at 10, and then one with no number because we

2    have ongoing negotiations with regard to how much you are going

3    to have to pay him to walk away.

4    Q.    And on all four of these documents, who signs on behalf of

5    PAAG Investment, LLC?

6    A.    Yeah, I can't -- it's an illegible signature.  But the

7    only person he was dealing with from PAAG was Rick Thompson.

8    Q.    Is Robert Koger's name anywhere on these documents?

9    A.    No, not to my knowledge, no.

10   Q.    Yet they were found in his house?

11   A.    Yes.

12   Q.    What, if any, airplane tickets did you find in the

13   defendant's house?

14   A.    Sir, we found a -- like a receipt from, I believe it was

15   August 1.  I stand to be corrected on the date.  But Mr.

16   "Stern" went down to visit Dr. Patel twice.  And what we found,

17   an airline receipt in Rob Koger's name for a flight from Tampa

18   back to Virginia on the date that Mr. Stern first visited Dr.

19   Patel in his Tampa office.

20   Q.    Please take a look at Government's Exhibit 7.

21            What is this?

22   A.    That's the receipt I was talking about.  This is a

23   passenger receipt dated 1 August 2013 in the name of Robert

24   Koger, and it is TPA, which I believe to be Tampa, to IAD,

25   which is Dulles.

C.E. Price, II - Direct

49

1    Q.    Please look at Government's Exhibit 8.

2    A.    Yes, sir.

3    Q.    What is this document?

4    A.    This is another document found in the search of the

5    defendant's house.  It's a -- the first page is a handwritten

6    FedEx receipt, and it's from -- it says, sender, Rick Thompson,

7    PAAG Investments, 620 New York Avenue, New York, New York to

8    Tom Smith, and that's the lawyer in Odessa, Texas.

9              The second page -- so, it's basically the receipt for

10   a FedExing down to Odessa, Florida.

11             The second page of the receipt is the actual, for

12   lack of a better term, the cash register receipt from FedEx

13   showing that this was sent from Vienna, Virginia, not from New

14   York City.

15   Q.    And how far is Vienna, Virginia from the defendant's home?

16   A.    Well, he lives in Oakton.  So, it is just down the road.

17   Q.    What, if any, cellular phones did you find in the

18   defendant's house?

19   A.    Well, we found the defendant's iPhone, which is the same

20   646 number that Dr. Patel was using to call Rick Thompson.

21   Q.    What, if any, large sums of cash did you find at the

22   defendant's home?

23   A.    Found a little over $4,000 cash in the defendant's wife's

24   safe.  And the defendant had, I think, $770 in his wallet.

25   Q.    During the search, did you or other FBI agents have an

C.E. Price, II - Direct

50

1    opportunity to talk with the defendant's wife, Melissa Koger?

2    A.    Yes.

3    Q.    What corroborating information did she provide to you with

4    respect to the allegations set forth in your affidavit?

5    A.    I showed her a still from the surveillance video at Dr.

6    Patel's office.  And she identified the person in that still as

7    her husband.  And she also said that he had been to Tampa,

8    Florida that day.

9    Q.    What, if anything, did she tell you about her and her

10   husband's ability to pay their mortgage?

11   A.    Well, she said that they had been for a long time

12   undergoing financial problems and they hadn't paid the mortgage

13   in over a year, and that they hadn't paid their hotel -- I am

14   sorry, their maid.  But that about a month or so ago her

15   husband had closed a deal and they had come into some money.

16   Q.    What, if anything, did she tell you with respect to the

17   recent purchase of a BMW?

18   A.    She said that her husband was currently employed by a

19   company in Florida, and that that company had provided him a

20   BMW, which is the car that she drove.  It's a 750i, I think,

21   2013.

22   Q.    What, if anything, did she tell you how she received the

23   money that was found in her personal safe?

24   A.    She said that Rob just put it -- excuse me, the defendant,

25   Mr. Koger, put it in there.

C.E. Price, II - Direct

51

1   Q.   And what, if anything, did she say about any deposits into

2   her bank account that Rob directed?

3   A.   She said she also got, in addition to the money in the

4   safe, she received $4,000 cash, which she deposited into one of

5   her bank accounts.

6   Q.   What, if anything, did Melissa Koger tell you about

7   whether her house was scheduled to be foreclosed upon in the

8   coming weeks?

9   A.   She said that it is up for foreclosure sale very shortly.

10  Q.   And what, if anything, did she tell you about where she

11  and her husband were going to live after it was going to be

12  foreclosed?

13  A.   She said she didn't know.

14  Q.   What, if anything, did she tell you about her desire to

15  know what Rob is doing?

16  A.   She was very upset, understandably, when I initially

17  talked to her.  And I said, let me tell you why we are here.

18  And she says, I don't want to know, I don't want to know.

19  Q.   Following the search of the defendant's home, did you have

20  the opportunity to talk with anyone from the dealership that

21  sold the defendant the BMW?

22  A.   Yes, I did.

23  Q.   Please describe that conversation.

24  A.   So, I went -- Mrs. Koger said that she had gone to pick up

25  the car at the BMW in Fairfax.  So, I went to the BMW in

C.E. Price, II - Direct

52

1    Fairfax and spoke with the gentleman, said I would like to talk

2    about the purchase of this vehicle.

3              I spoke with the gentleman who sold the car to Mr.

4    Koger.  And he said that Mr. Koger and his wife had come in.

5    Mr. Koger said, I am the president of a corporation in Florida,

6    or I own a corporation in Florida, I want to buy this car, and

7    I want it titled in my corporation's name and registered in

8    Florida.  And that the car was actually for his wife, and that

9    she is one that did the test drive.

10   Q.    Please turn to Government's Exhibit 9.

11   A.    Yes.

12   Q.    What is this?

13   A.    So, these are some of the documents that I received from

14   the BMW dealership.  The first document is a state of Florida

15   application for vehicle license under the name Hotel Assets

16   International, Inc., Woodstock Road, Odessa, Florida.

17             The second is the title for the car in the same

18   corporate name and address.

19             The third is the price of the car, $98,973.68.

20             And then the next document is Mr. Koger's driver's

21   license.

22             The next is a business application sheet which the

23   dealership required Mr. Koger to fill out and which was filled

24   out by Mr. Koger, according to the dealership.  In which they

25   list the officers of the corporation as Thomas Smith,

C.E. Price, II - Direct

53

1    president.  That's the lawyer from Florida.  And R.T. Koger,

2    director.  And indicating they both own the business 50/50.

3             The next is an iPortfolio handwritten check to BMW,

4    and purportedly signed by Rob Koger according to the BMW folks.

5             Next is the $12 disclosure statement purportedly

6    signed by Rob Koger according to the folks at BMW.

7             And the last is a screen shot of who they indicate,

8    you know, owns the car.

9    Q.   To be clear, this car is not registered to Lodging

10   Capital?

11   A.   No.

12   Q.   You have previously discussed, and I won't cover it again,

13   your conversation with Thomas Smith.  Just to be clear, what,

14   if anything, did he tell you about his relationship to Hotel

15   Assets International?

16   A.   Well, first of all, he said he incorporated -- he is an

17   attorney in Florida.  And that at Rob Koger's request he

18   incorporated the entity Hotel Assets International, Inc. and

19   agreed to serve as the registered agent of that entity.  The

20   Woodstock Road, Odessa, Florida address is his business

21   address.

22            I referred -- I told him that I was looking at a

23   business services application that listed him as the president

24   of that entity and that he owned 50 percent of the entity.  He

25   said that is absolutely not true.  That the only thing he did

C.E. Price, II - Direct

54

1  was incorporate it, physically.  You know, he filed the

2  corporate papers to create the entity and agreed to serve as a

3  registrar, but he is not the president, he does not have an

4  ownership interest, and he says that the representations here

5  were false.

6  Q.  What, if anything, did Mr. Smith say about whether he

7  wired $25,000 in proceeds from the first Patel transaction, as

8  I will call it, to Rob Koger?

9  A.  Right.  So, he said that he did.  He said that -- and then

10 just to clear up and be precise, that Rob Koger asked him to

11 introduce Rick Thompson to Dr. Patel.  That Mr. Smith believes

12 that Rob Koger is a different person from Rick Thompson.  And

13 that eventually Rick Thompson told Dr. Patel, hey, you can deal

14 with Rob Koger as my agent and he can give you instructions on

15 what to do.

16       And so, most of the dealings -- well, I shouldn't say

17 most.  The dealings were split between Rob Koger with a hat on

18 as agent for Rick Thompson and then "Rick Thompson."

19       When the deal was consummated and he got the money,

20 Dr. Patel -- or, I'm sorry, Mr. Smith said that he transferred

21 $75,000 to his account.  50 of that 75 was his payment for

22 assisting in the transaction.  And he was directed, and he said

23 he believed it was by e-mail, received directions to send

24 25,000 to Rob Koger, and then the rest to the Bahamas.

25 Q.  And what, if anything, did TS know as of your last

C.E. Price, II - Direct

55

1    conversation, which I believe you said was on Friday, about the

2    whereabouts of the remaining approximately $2.4 million that

3    was first sent to his escrow account but then transferred to

4    the Bahamas?

5    A.   He said he had no clue where it was.

6    Q.   What, if anything, did TS tell you about a proposal made

7    to him, TS, by Rob Koger this past summer to engage in a scheme

8    to flip hotels with Dan Larkin?

9    A.   He said that this past summer Mr. Koger asked whether he

10   would be willing to serve as a straw buyer during the flip of

11   hotels.  And he had discussions with Mr. Koger about that.  He

12   also had discussions with Dan Larkin, who he understood to be a

13   lawyer in London regarding that.

14          And after a period of discussions and e-mails back

15   and forth, he decided that he didn't want to be involved

16   because he questioned the legality of what they were asking him

17   to do.

18   Q.   You previously said you have been investigating the

19   defendant for more than a year now?

20   A.   Right.

21   Q.   And during that time, what have you learned about the

22   defendant's ability to assume fake identities?

23   A.   I investigated a number of transactions, and I think I

24   have over a dozen instances where the defendant has used fake

25   identities to further transactions.

C.E. Price, II - Direct

56

1  Q.   I am not going to go through them all, but let's go

2  through some examples.  How did the defendant use the name

3  Sonny Jones?

4  A.   So, the Sonny Jones occurred -- after we did the search

5  warrant on the defendant's house we, as Mr. Greenspun talked

6  about earlier, we met with Mr. Koger and listened to his

7  defense of the -- regarding the big Host suit.  And essentially

8  what he said was, hey, I am being framed by Host, that there

9  are exculpatory documents that exist, that they are hiding them

10  from you, and that if you would see these documents, you would

11  see that I'm telling the truth.

12        Then AUSA Rich received an incoming e-mail from Sonny

13  Jones which basically said the same thing.  It said, hey, I

14  need to -- would you please send me Mr. Koger's defense

15  attorney's name and contact information, I believe that Mr.

16  Koger is being framed, I am a former Host employee, and I know

17  that there are documents out there that are essentially

18  exculpatory, and I am going to put those documents forward to

19  the defense.  He says, I don't want talk to you yet because,

20  you being the Government, yet because I'm in the process of

21  negotiating a, whatever, a buy -- not a buy-out, but like a

22  severance, and I don't want to -- I don't want to mess that up.

23  But at an appropriate time I will give the documents to you

24  too, but right now I want to get give them to the defense

25  attorney.

C.E. Price, II - Direct

57

1   Q.   Why do you think that Sonny Jones is Robert Koger?

2   A.   Well, because we traced those e-mails back, they were sent

3   from two hotels.  We pulled the video from those hotels.  We

4   saw the defendant in both videos.  We used that to get PC for a

5   search warrant.  We executed a search warrant at the house.

6   And in one of the -- two things happened in that search

7   warrant.

8           Number one, Mr. Koger's wife identified him in the

9   video from where one of the e-mails were being sent from as the

10  person in the video.

11          And in addition, there was a distinctive T-shirt, I

12  think it was Punta Mita, from a resort in Mexico, that the

13  individual in the photograph was wearing.  And we seized that

14  T-shirt from Mr. Koger's house.

15  Q.   Just very briefly --

16          THE COURT:  When -- just when was that trip?  The

17  trip to Mexico, that he was in Mexico?

18          THE WITNESS:  Well, I don't know when he was in

19  Mexico.  I just know June 10 I pulled the T-shirt from Mexico

20  out of his -- out of his house.

21          THE COURT:  Okay.  But the hotels that the e-mails

22  were sent were not outside of the United States?

23          THE WITNESS:  No, sir.  There was one in the Herndon

24  area and one in suburban Maryland.

25  BY MR. GOLDER: (Continuing)

C.E. Price, II - Direct

58

1    Q.   And to be clear, have you spoken to any witnesses who said

2    they traveled with the defendant to the Punta Mita hotel?

3    A.   Yes, I spoke with Steve Fairbanks, who said that he and

4    his wife and the defendant and his wife went to a trip to Punta

5    Mita, and they both bought T-shirts there.

6    Q.   And speaking of Steve Fairbanks, do you have evidence that

7    the defendant assumed his identity as well?

8    A.   Yes, I do.  As one of the non-Host flips occurred in 2005

9    and involved the Reande Continental Hotel in Florida.  One of

10   the intermediate buyers in there, for lack of a better term,

11   the straws, was Steve Fairbanks.

12            I spoke with Steve Fairbanks and said, have you been

13   involved in this hotel?  He said, I have absolutely no

14   involvement in the deal.

15   Q.   What evidence do you have of the defendant's use of the

16   name Stan Jenkins?

17   A.   So, Stan Jenkins was -- when we executed the very first

18   search warrant at the defendant's house, we found three throw

19   phones.  One of those throw phones was in the name Stan

20   Jenkins.  And we had previously identified a complainant who

21   was involved in a -- was involved in a -- contemplating being

22   involved in a business transaction, flipping a hotel in Florida

23   with Stan Jenkins.  That throw phone was in the house.

24            We contacted, I believe it's Hyatt or Hilton, one of

25   the two, whoever is in Chicago, we talked to the folks there.

C.E. Price, II - Direct

59

1    They said, yes, we're dealing with a Stan Jenkins, but we're

2    going to drop out of the deal because Stan Jenkins sent us a

3    document regarding Encor Investments, which is one of the

4    d/b/as, and we looked at the properties on that, you know, from

5    the metadata, and it looked like -- it indicated it was created

6    by Rob Koger.

7            That gentleman then called Koger direct and said, I

8    believe you -- or called Stan Jenkins and said, I believe you

9    are Rob Koger.  The response was, you can't prove that in

10   court.

11   Q.   What, if any, evidence do you have regarding the

12   defendant's use of the name John Lovell?

13   A.   The defendant admitted to me with counsel present that he

14   during --

15           MR. GREENSPUN:  Objection, Your Honor.  Anything that

16   occurred in meetings with the Government is not the proper

17   subject of this hearing.

18           THE COURT:  Well, help me with why, if your client

19   made a statement with you present to the Government, I am not

20   entitled to hear what that statement was?

21           MR. GREENSPUN:  Your Honor, these are proffer

22   sessions.

23           MR. GOLDER:  Your Honor, there was no proffer letter

24   or there were no plea offers on the table at the time.  But

25   there is other evidence if Your Honor would like --

C.E. Price, II - Direct

60

1          THE COURT:  Let's just move on.

2          MR. GOLDER:  Yes.

3  BY MR. GOLDER: (Continuing)

4  Q.   What other evidence do you have that he used -- the

5  defendant used John Lovell's name?

6  A.   So, in one of the transactions the lawyers in Philly, Fox

7  Rothchild, received an identification in the name John Lovell.

8  One the defendant's former co-workers or chief operating

9  officer of Molinaro Koger said that he had been approached

10  by -- he being Jonathan Propp, the COO of Molinaro Koger, had

11  been approached by Koger to create a driver's license in John

12  Lovell's name and that they were using that as a straw.

13          In addition, Rick Harris, another Molinaro Koger

14  employee said he too had been approached by the defendant to

15  create a driver's license in John Lovell's name.

16  Q.   Just briefly so we don't have to run through them, what

17  other names and identities has the defendant used, to your

18  knowledge?

19  A.   So, Jean Frasell -- Jean Frasell is J-e-a-n Frasell, is a

20  college classmate and friend of the defendant.  John Frasell,

21  J-o-h-n, Frasell is the name in which the Reande Continental

22  Hotel was flipped.  The real Jean Frasell said he wasn't

23  involved in that transaction.

24          Mike Mason is another name that was used.

25  Q.   Terrence Lloyd?

C.E. Price, II - Direct

61

A.   Terrence Lloyd, right.  Sorry, I had forgotten that.
Terrence Lloyd was an employee of the defendant, he was an IT
fellow there.  He passed away in the beginning of 2010, and his
name was used to flip a hotel after he died.

     And Jonathan Propp said that at the defendant's
request he obtained a driver's license from the deceased Mr.
Lloyd's mother and used that -- sent that up to -- and that was
sent up to Philly to the lawyers, the transaction lawyers who
requested it.

Q.   Just briefly, during the course of your investigation of
the defendant, what have you learned about his ability to
create fake e-mail accounts to support these fictitious
entities?

A.   So, there are obviously a fake e-mail account in Sonny
Jones that was used to send to AUSA Rich, and both Harris and
Propp have indicated that that was part of the modus operandi
that he used when dealing with other people, he would have a
fake e-mail account created.

Q.   During the course of your investigation, what have you
learned about the defendant's ability to fabricate court
documents?

A.   So, Mr. Smith, the lawyer in Florida, told me that prior
to this entire Tampa deal, he represented a fellow by the name
of John Lonney who was suing Mr. Koger.  And in connection with
that, Mr. Koger sent him two documents, one that purported to

C.E. Price, II - Direct

62

1    be a dismissal of a lawsuit signed by a federal judge.  Later

2    determined that that was a fake document.  That number one, the

3    case was brought in state court, not federal court.

4              MR. GREENSPUN:  Your Honor, I have an objection.

5    There is a real privilege, attorney/client privilege issue

6    here.  I am not sure that whatever Mr. Smith said should have

7    been disclosed as far as from a privilege point of view.

8              THE COURT:  Well, yeah, I think we're kind of piling

9    on here, I think, Mr. Golder, to some extent.

10             MR. GOLDER:  I just would say, just to protect

11   ourselves, Mr. Greenspun began asking the questions about Mr.

12   Smith's conversations, so I think those doors were opened.

13             THE COURT:  Yeah.

14   BY MR. GOLDER: (Continuing)

15   Q.   Just briefly, please turn to Government's Exhibit 11.

16             And I promise, Your Honor, I will run through these

17   quickly.

18   A.   Okay.

19   Q.   What is this document?

20   A.   So, this is a letter that a lawyer for the defendant's

21   mother sent to the Connecticut FBI asking that the FBI open an

22   investigation into her son's efforts to fraudulently transfer

23   title to a familial home.

24   Q.   Would you please turn to Government's Exhibit 12.

25             What is that?

C.E. Price, II - Cross

63

1   A.   Showing one of the Ponzi schemes, which is another -- kind

2   of associated with the Host, occurring at the same time, but a

3   little bit different.  This is Mr. Koger was in discussions

4   with the plaintiff in that case, and he signed this confessed

5   judgment acknowledging in paragraph 6, 6B, that he stole a

6   million dollars in escrow that had been provided to him with

7   the transaction.  And that he used it for his own purposes and

8   benefit contrary to the authorization by the person that

9   provided them and in breach of his fiduciary responsibility to

10  that person.

11          MR. GOLDER:  No further questions, Your Honor.

12          THE COURT:  Okay.

13      CROSS-EXAMINATION

14  BY MR. GREENSPUN:

15  Q.   Special Agent Price, the first search of the Koger

16  residence in Oakton was approximately mid-April of last year,

17  is that right?

18  A.   No, I think it was in October of last year, wasn't it?

19  Q.   I'm sorry, October of last year.

20  A.   Right.

21  Q.   I think that's right.  And then there was a search of the

22  Koger residence in May, late May early June of this year,

23  correct?

24  A.   June 10, yes.

25  Q.   And then last week concurrent with the arrest, is that

C.E. Price, II - Cross

64

1  right?

2  A.    Yes, sir.

3  Q.    And every indication was that Mr. Koger lived there at the

4  house in Oakton on all three search occasions, right?

5  A.    Yes, sir.

6  Q.    As far as you knew, he had no idea that you were coming,

7  that there was a search warrant that was going to be served on

8  those occasions, right?

9  A.    I had no knowledge that he knew, right.

10  Q.    Say that again.

11  A.    I had no knowledge that he was aware I was coming.

12  Q.    Okay.  So, you don't believe that he was aware --

13  A.    I hope not.

14  Q.    All right.  And the -- and as was indicated, there have

15  been a number of meetings between the law enforcement, Mr.

16  Koger, myself, and other communications over the time period

17  from October through the current time, is that right?

18  A.    Yes, sir.

19  Q.    All right.  And without going into any details, there have

20  been discussions which encompassed a lot of things, including

21  the possibility of pleas and cooperations and different things,

22  right?

23  A.    Yes, sir.

24  Q.    All right.  And deadlines set by the Government or else

25  they were going to indict in the near future going back into

C.E. Price, II - Cross

65

1    last -- late winter or early spring, right?

2    A.   Well, I think there were deadlines set for a plea, but not

3    that we were going to indict right after if you miss a

4    deadline.

5    Q.   I don't mean the next week, but that he would have to

6    accept an agreement, I think the last one was late April,

7    right?

8    A.   I can't remember, but I take your word for the date.

9    Q.   All right.  And I in fact -- and you are aware that I

10   wrote to the Government and said, nope, can't do, and we'll be

11   completely cooperative as far as if there is an indictment,

12   turning in Mr. Koger, and all that kind of thing, right?

13   A.   Yes, sir.

14   Q.   You are aware of that, right?

15   A.   Yes.

16   Q.   All right.  So, it would be no surprise then to Mr. Koger

17   that the investigation was ongoing and there was a likelihood

18   of indictment no matter what the subject matter was, right?

19   A.   Right, of the Host and Ponzi scheme, yes.

20   Q.   And the Guidelines that were discussed with regard to the

21   Host and Ponzi allegations were in excess of 20 years, were

22   they not?

23   A.   Yes, sir.

24   Q.   All right.  And except for this purported business travel,

25   Mr. Koger has been in Oakton, Virginia in Fairfax County,

C.E. Price, II - Cross

66

1    hasn't he?

2    A.    I have no idea where he's been.

3    Q.    All right.  Well, you have no information that, except for

4    going out of town for business or meeting with lawyers or

5    things like that, that he has been anywhere but Oakton,

6    Virginia, right?  He hasn't disappeared?

7    A.    Well, no, he hasn't disappeared.  But again, as of two

8    weeks ago, I didn't know he was in Tampa.  So, I can't vouch

9    for where he's been.

10   Q.    I am not asking you to vouch for where he's been.  You

11   have no indication of attempts to set up a different household

12   or identity for escape purposes or anything like that?

13   A.    Well, I know he asked for his passport back, so that --

14   Q.    Well --

15   A.    I guess he expects on traveling there.

16   Q.    All right.  So, with regard to the passport, that came

17   about because I spoke in direct fashion with Mr. Golder about

18   ten days ago that Mr. Koger had to do a wind-down on a Molinaro

19   Koger business entity in London and he needed to be there,

20   right?

21   A.    Yes, sir.

22   Q.    And you seized the passport in October, and you or

23   somebody has been in possession of it ever since, right?

24   A.    Yes.

25   Q.    All right.  So, your concern is that I contacted Mr.

C.E. Price, II - Cross

67

1    Golder to see about contacting you for the release of this.

2    And I told him what it was about, didn't I?

3    A.    Right.  But the concern is that he sold Molinaro Koger in

4    2011.  So, I don't think there should be any wind-down

5    activities in 2013.

6    Q.    Did you or anyone call me up and ask what it was about or

7    to get more information?

8    A.    No, sir, I didn't.

9    Q.    And you are aware that I told Mr. Golder I had seen

10   e-mails from the people in London that this related to?

11   A.    I was not aware of that.

12   Q.    And the purchase of the car had Mr. Koger's -- purchase,

13   lease, whatever it was of the car, had Mr. Koger's proper name

14   and information on it, is that correct?

15   A.    No.

16   Q.    It had Roger -- Robert T. Koger, did it not?

17   A.    Well, no.  It had Robert -- it had the business entity, it

18   had an address in Florida, and a disconnected telephone number.

19   Q.    Okay.  And the -- I think I misspoke.  That the UK company

20   is not a Molinaro Koger, but it's another Koger entity from

21   years ago.

22           The check that is part of exhibit -- the BMW exhibit,

23   whatever number that is, 9 I guess it is.

24           THE COURT:  Yes.

25   Q.    That lists Mr. Koger's proper address, does it not?

C.E. Price, II - Cross

68

```
1   A.   Let me check here real quick.

2             Yes, sir.

3             THE COURT:  Well, let me -- if you look under

4   personal guarantor where he is applying for the financial

5   services, he has personal guarantor, co-applicant personal

6   information.  He has R. Timothy Koger, present address as being

7   in Odessa, Florida.

8             Wasn't there testimony that that was Mr. Smith's

9   office address, not his personal address?  That he has lived

10  there for seven years?

11            MR. GREENSPUN:  I'm sorry, were you asking the

12  witness --

13            THE COURT:  Well, you've got a driver's license --

14            MR. GREENSPUN:  With the proper address.

15            THE COURT:  Proper address.  But you've got this BMW

16  financial services business application where you have got the

17  information of business information, and then you have got

18  personal guarantor, applicant personal information.  And there

19  he puts his personal information as his present address as

20  being in Florida, is that right?

21            MR. GREENSPUN:  Apparently.  This is the first time

22  seeing these.  But it also has his proper Social Security

23  number, what I will confirm is his proper Social Security

24  number.

25            THE COURT:  The only place that he has written his
```

C.E. Price, II - Cross

69

1   personal information, other than giving them the driver's

2   license, is on this business application, right?

3   BY MR. GREENSPUN: (Continuing)

4   Q.   So, the owner of the vehicle by this documentation was

5   Hotel Assets International, which is incorporated in Florida,

6   correct?

7   A.   Right.

8   Q.   And the -- so, it was a business -- it was a car that was

9   owned by the corporation, but was being licensed and used in

10  Virginia, is that right?

11  A.   No.  It was owned by the corporation, licensed in Florida,

12  so it had Florida tags, used by Mrs. Koger in Virginia, right.

13  Q.   So, there was no hiding the vehicle as far as you knew,

14  right?

15  A.   Well, yeah, because if you ask to see who it is, it

16  says -- you go to Thomas Smith, the president, who owns the

17  corporation.  He doesn't own the corporation.  The vehicle

18  isn't in Florida.  And it's being driven here.

19       So, if we were to run the tags, if we did a car stop,

20  that car would come back to Florida, to a company in Florida.

21  When in fact it's a car owned by Rob Koger in Virginia.  But we

22  would not -- based on the run of the tag with this information,

23  you could see on the first page where it is going to come back

24  to Hotel Assets, Woodstock, Florida, Odessa -- Woodstock Road,

25  Odessa, Florida.

C.E. Price, II - Cross

70

1          So, that hides the fact, based on, you know, what you

2    would see in a car stop and run by NCIC, who really owns the

3    car.

4    Q.   So, then they would talk to Tom Smith.  And then he would

5    say, no, you have got to talk to Koger about that?

6    A.   Right.

7    Q.   Presumably?

8    A.   Presumably, right.

9    Q.   And then if you ran the VIN number, went back to BMW of

10   Fairfax, then they would have all the information about the

11   purchase, his license number, the check with his address and

12   all of that kind of thing, is that right?

13   A.   Sure.

14   Q.   So, it appears while there may have been concerns that he

15   wanted it owned in this entity in Florida, there were no

16   concerns that Mr. Koger was part of this transaction, were

17   there?

18   A.   No.  He definitely is listed as part of the transaction.

19   The question is, can you tie the asset to him?  It is a

20   corporate asset.

21   Q.   Right?

22   A.   It is not a personal asset.

23   Q.   And there is no question you can tie it to him and the

24   paperwork shows that quite readily?

25   A.   After investigation, sure, but not based on what you see

C.E. Price, II - Cross

71

1   in a car stop.

2   Q.   In a car stop.  If you get a speeding ticket, it would

3   look like it is owned by a Florida corporation?

4   A.   Or if you are trying to figure out who drives the car, who

5   the car belongs to, it would look like a Florida corporation.

6   Q.   During the course of a lot of this back and forth with the

7   Government between, you guys and us, when you asked for

8   information, you would direct that to me, and I would obtain it

9   if I could obtain it, we would discuss it, right?

10          When I say you, I mean you and the counsel?

11  A.   Yes.

12  Q.   And all during that time, October until last week, Mr.

13  Koger had no reason to believe that the Government was backing

14  off of the Host prosecution, did he?

15  A.   No, sir.

16  Q.   And any reasonable interpretation by him would be that the

17  Host indictment was coming at some point?

18  A.   Yes, sir.

19  Q.   And he didn't go anywhere to flee from a flight point of

20  view?

21  A.   Well, he asked for his passport, which means I think he is

22  thinking about going somewhere.

23  Q.   Okay.  Up to that point -- I obviously made the mistake of

24  asking for the passport after almost a year.  You had no

25  indication that he was attempting to flee or to disappear, did

C.E. Price, II - Cross

72

1   you?

2   A.   Well, the $2.4 million sent overseas is an indication.

3   Q.   Sure.  And that would have provided presumably somebody

4   the ability to lose themselves either within or outside of the

5   United States by surreptitious means, wouldn't it?

6   A.   2.4 million?  Sure.

7   Q.   And he was still here at 6:30 in the morning when you got

8   him out of bed last week?

9   A.   Because he didn't have his passport.

10           MR. GREENSPUN:  Oh, right.

11           THE COURT:  Okay.  Do you have --

12           MR. GOLDER:  No further questions, Your Honor.

13           THE COURT:  You may step down.  Thank you.

14           NOTE:  The witness stood down.

15           THE COURT:  Any other evidence on the Government's

16   behalf on the issue of detention?

17           MR. GOLDER:  No, Your Honor.

18           THE COURT:  Mr. Greenspun, any evidence or proffers

19   you want to make on the issue of detention?

20           MR. GREENSPUN:  Your Honor, Mrs. Koger is here in the

21   middle of the courtroom.  She has been -- I am not sure if she

22   was present during the second search, but she is well aware of

23   the circumstances.  She stands by her husband and is here and

24   is an appropriate third-party custodian.  She is certainly

25   available to be questioned if Your Honor has any inquiry to

73

1    make of her.  But I would just proffer her presence in this

2    court.

3           THE COURT:  Thank you.  I will hear any argument that

4    you want to make on the issue of probable cause and detention.

5    I just need to hear from Mr. Greenspun.

6           MR. GREENSPUN:  Okay.  Your Honor, with regard to

7    probable cause, Your Honor pointed out, and I am not going to

8    belabor it, it is a very low standard.  I learned that from

9    Judge Hammer in the Fairfax County General District Court.

10   He'd keep saying to me, Greenspun -- as a very young lawyer, do

11   you know how low the standard is?

12          But there has to be some degree of credible evidence.

13   And I suspect what I'm going to hear is, these are interesting

14   trial issues, but they're not probable cause issues.

15          Your Honor knows my arguments, that -- I think

16   without me stating them.  I will do it in summary fashion.  Is

17   that the affidavit, from what you have heard, does not have the

18   typical backup and corroboration and substance as far as the

19   factual allegations regarding the

20   Koger/Thompson/PAAG/Patel/Wyndham transactions, either one of

21   the transactions are concerned.

22          And at best the Government has, excuse me, raised

23   suspicions with regard to the name issues.  They are certainly

24   unseemly, there is no question about that, but that there is

25   little, if any, evidence of criminal conduct here.  And that

74

1    the two-and-a-half million dollars is essentially misstated or

2    misrepresented to the Court in the affidavit as being funds

3    that were to be escrowed and so on.

4            The evidence is to the contrary.  No matter what the

5    witness says, is that the money was not to be escrowed and

6    held, it was a fee on the walk-away from that deal was

7    concerned.

8            And so, the Government wants the Court to start

9    looking at it with a skewed eye in that regard when there is no

10   evidence of any wrongdoing in that regard.  And you can see how

11   with the dates and the actions on both sides that this was

12   perhaps at worst slick business transactions of two sides

13   trying to get an advantage on the same deal, but that it's

14   hardly criminal.

15           THE COURT:  What about the issue of detention?  I

16   will hear from you on that.

17           MR. GREENSPUN:  Your Honor, the issue of detention.

18   On April 22 I wrote to the Government in response to a number

19   of issues, which I won't address here, but said, basically,

20   thanks for the offer, but no.  And Koger is here, and contact

21   me, and we'll make all the arrangements and we'll do all the

22   things that need to be done.

23           Even to the extent that in writing, and we're

24   collegial except when we are heading with each other, that

25   let's figure out, since this will be a three or four or five or

1    six-week trial, let's figure out what window to block out as

2    far as indictment and trial is concerned and so that we can

3    work this as reasonably as possible from that point of view.

4            The Guidelines are huge in this case.  And Mr. Koger,

5    if he had $2.4 million as of the beginning of July -- Special

6    Agent Price kept going back to the passport.  For $2.4 million

7    of disappeared money, cash, you can disappear yourself if you

8    have any intention to do that versus staying and contesting the

9    charges.

10           Obviously there is concern about these identity

11   issues and so on.  Much of it is business.  Some of it is of

12   real concern, I understand that.  But all that can be

13   accommodated by Pretrial Services with GPS monitoring.

14           I think to the extent of risk of flight, and I think

15   that's -- to me that appears to be the issue.  As far as risk

16   of flight is concerned, you look at the past to predict the

17   future.  If somebody had the ability to flee, which by all

18   his -- they point out all the identity fraud and the documents

19   that he could make or so on and having over $2 million.  If

20   anybody could up and make themselves disappear in light of a

21   pending 20-year Guidelines indictment, in excess of 20 years,

22   that is something that Mr. Koger would have done if he was

23   going to do that at all.  And he hasn't done that.

24           Between the Government having his passport, the

25   notice which would be appropriate to give to the State

76

1    Department not to reissue a passport, and GPS monitoring with

2    all of the typical conditions and safeguards in that regard, no

3    presumption in this case, I believe that the conditions can be

4    fulfilled.

5            I would point up to the Court one other case that we

6    were all involved in, Mr. Golder wasn't, but Special Agent

7    Price, Mr. Rich, and I were where there was a bond that took

8    two months for another prior attorney to get Mr. Rude out on

9    bond.  And the Government was convinced he was going to go, he

10   was going to go, he was going to go, until he drove himself

11   right down to the facility that the Bureau of Prisons

12   designated on the date of that designation.

13           And that was a person who had flown for many years so

14   far under the radar as far as his lifestyle and taxes and this

15   and that is concerned, where the Government was convinced that

16   he had stashed huge amounts of cash, and he reported to the

17   Bureau of Prisons.

18           I have no question that whatever the result will be,

19   that Mr. Koger will comply with the conditions of release.  He

20   is not a risk to the community, and he is not a risk of flight.

21           And the evidence -- the evidence here is thin at

22   best.  It's certainly contested and contestable.  This isn't --

23   you read the affidavit and then you hear what in fact isn't the

24   case.  The affidavit looks, wow, what's going on here?  This

25   is -- this is, what's that TV show, Greed or something.  And

77

1    then you hear about what the facts are, and Patel being under

2    investigation, and looking to get his own tail out of trouble,

3    and that's part of it, and the things that weren't in the

4    affidavit that the Court now knows, this is anything but a

5    clear cut case from that perspective as well.

6              THE COURT:  Well -- and I don't want to belabor this

7    too much, but one thing I want you to address because it is

8    something that concerns me, we didn't talk about it too much,

9    is you have somebody who may have 2.4 million secreted away,

10   but he is also trying to then undergo and do another scam, for

11   lack of a better word, to where he can increase that by another

12   9 to $11 million.  So that he could really live large if he

13   tries to run away.  That maybe 2.4 isn't enough for the

14   lifestyle that he wants to lead.  And that he is, you know,

15   getting this one last one put together so that he can pack up

16   and get out of here.

17             And there is evidence in the affidavit, you have got

18   to pay this quick, you know, this break-up fee.

19             MR. GREENSPUN:  Judge --

20             THE COURT:  Address that, because that's a serious

21   one.

22             MR. GREENSPUN:  I understand.  Part of my problem is

23   this is very big and complex, and all these people and

24   personalities, and --  well, I didn't know anything about this

25   hotel buying/selling thing before a year ago.  And I have

78

1    learned a great deal about it, not enough, I am sure, but this

2    is a fast-moving industry.

3           It was our belief and it was Mr. Koger's belief that

4    Patel was in -- he was the one who was in default.  And Stern

5    is there to nudge that, to see whether or not he is doing

6    things -- and I don't think you had the proposed purchase

7    agreements.  The LOI called for a PSA, a purchase and sale

8    agreement, to be signed by the end of the month or August 1

9    maybe.  And that's the one that they ignored.  And they had

10   information about what Patel was trying to do by going around

11   the transaction.

12          And so, the break-up fee was because Patel was in

13   default.  And he was also, Patel that is, was also in default

14   on the mortgage on the Pittsburgh Wyndham Hotel as well.  And

15   so, Patel had to do what he could do to save that because it

16   would be foreclosed on.  That's why he didn't -- he being

17   Patel, wanted the month of July in order to do the purchase of

18   the note because he could purchase the note under whatever

19   identity he used, which really had a value of about 50, a debt

20   of about$50 million for $40 million, and he didn't want Wyndham

21   to know it was he because then Wyndham would say, why would we

22   do that?  That hotel has way more value than that in that

23   regard.

24          So, it was all fast moving and being handled

25   legitimately.  I understood the concern about Stern and so on,

79

1    but being handled in that world that I suspect none of us

2    travel in -- and that's part of what that was.

3            One minute.  I said Wyndham.  It was probably -- it

4    was the seller of the note.

5            You know, the reality is that if a lawsuit had been

6    filed -- and I have spoken to the attorney that Mr. Koger had

7    consulted with about suing Patel for this break-up fee for this

8    $15 million, that was going to be litigation which was going to

9    be brought probably in federal court in Pittsburgh.  It was a

10   large major firm that was being consulted as far as that is

11   concerned.

12           Patel knew that from these communications.  And so,

13   he is using the Government in that regard to do his bidding

14   also.

15           I understand it is complex and convoluted and

16   interesting, but I don't think that predicts that he was trying

17   to get another $10 million to go live on a beach somewhere

18   where the Government would never find him.

19           I think two-and-a-half million dollars with his

20   contacts would have been just fine if that was going to occur.

21           THE COURT:  Mr. Koger, would you please stand.

22           Mr. Koger, I have spent considerable time this

23   afternoon hearing the testimony that has been presented here

24   both on the issue of probable cause and on the issue of

25   detention.  And I hope you can tell I have read the affidavit

80

1    that was submitted in support of the criminal complaint and the

2    information that was provided to me by the Pretrial Services

3    report.

4            And based on all of the information that has been

5    provided, and the evidence that we have had here today, and the

6    arguments of your counsel, I do find -- and as your counsel has

7    recognized, the issue in front of me today, at least on the

8    probable cause one, is a very low bar.  That is, is there

9    probable cause to believe that the charges that are brought

10   against you are true and correct.  And, you know, certainly

11   that hurdle has been crossed.

12           I think there is sufficient evidence to establish

13   probable cause on the charge of mail fraud.  So, the case will

14   be proceeding as charged and go to the grand jury as necessary.

15           The issue of detention.  I also find that based on

16   the evidence that I have heard here today, that there is no

17   single condition or combination of conditions that would

18   satisfy me either that you would appear at further proceedings

19   or that the safety of the community could be assured.

20           I mean, the charges here are significant.  The

21   information that I have heard here today even causes me even

22   more concern about other activities.  Your use of multiple

23   names, different e-mail addresses, your business activities.

24           We certainly know that there is $2.4 million that is

25   unaccounted for at this stage.  It's clear that you were

1  undergoing this conduct knowing about current investigations

2  and were trying to -- you had netted at least $2.4 million as a

3  result of this.  And you were still under a different name

4  going forward and trying to get some additional money through

5  the Stern activity.

6          So, I don't find that I can set any conditions that

7  would satisfy me that you would either appear for the

8  proceedings or the safety of the community could be assured.

9          So, you will be remaining in custody.

10         Okay.  Thank you, counsel.

11         MR. GREENSPUN:  Thank you, Your Honor.

12         MR. GOLDER:  Thank you, Your Honor.

13         NOTE:  The hearing concluded at 4:06 p.m.

14     ------------------------------------------------

15         C E R T I F I C A T E  of  T R A N S C R I P T I O N

16

17         I hereby certify that the foregoing is a true and
   accurate transcript that was typed by me from the recording
18 provided by the court.  Any errors or omissions are due to the
   inability of the undersigned to hear or understand said
19 recording.

20         Further, that I am neither counsel for, related to,
   nor employed by any of the parties to the above-styled action,
21 and that I am not financially or otherwise interested in the
   outcome of the above-styled action.

22

23

                        /s/ Norman B. Linnell
24                      Norman B. Linnell
                        Court Reporter - USDC/EDVA

25